RECORD NO. 18-1827

𝕴𝖓 𝕿𝖍𝖊

# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

𝕱𝖔𝖗 𝕿𝖍𝖊 𝕱𝖔𝖚𝖗𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## LULA WILLIAMS; GLORIA TURNAGE;
## GEORGE HENGLE; DOWIN COFFY; FELIX GILLISON, JR.,
**on behalf of themselves and all individuals similarly situated,**

*Plaintiffs – Appellees*,

**v.**

## BIG PICTURE LOANS, LLC;
## ASCENSION TECHNOLOGIES, LLC,

*Defendants – Appellants*,

**and**

## MATT MARTORELLO; DANIEL GRAVEL;
## JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK;
## SUSAN MCGESHICK; GIIWEGIIZHIGOOKWAY MARTIN,

*Defendants*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

―――――――

## BRIEF OF APPELLANTS

―――――――

William H. Hurd
David N. Anthony
Timothy J. St. George
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, Virginia 23219
(804) 697-5410

Justin A. Gray
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, Michigan 49071
(269) 283-5005

*Counsel for Appellants*

*Counsel for Appellants*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __18-1827__      Caption: __Williams, et al. v. Big Picture Loans, LLC, et al_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Ascension Technologies, Inc._____
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                    ☑YES ☐NO
        If yes, identify all parent corporations, including all generations of parent corporations:
        Tribal Economic Development Holdings, LLC

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                            ☐YES ☑NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ David N. Anthony_____     Date: ____August 6, 2018_____

Counsel for: _Appellants_____

## CERTIFICATE OF SERVICE
**************************

I certify that on ____August 6, 2018____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_/s/ David N. Anthony_____               _____August 6, 2018_____
            (signature)                                              (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  <u>18-1827</u>          Caption:  <u>Williams, et al. v. Big Picture Loans, LLC, et al</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Big Picture Loans, LLC</u>
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                         ☑ YES ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:
        Tribal Economic Development Holdings, LLC

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                             ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ David N. Anthony                    Date:    August 6, 2018

Counsel for: Appellants

## CERTIFICATE OF SERVICE
***************************

I certify that on    August 6, 2018    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ David N. Anthony                              August 6, 2018
        (signature)                                    (date)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................iv

INTRODUCTION .............................................................................................1

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION .........................................................................2

STATEMENT OF ISSUES ................................................................................3

STATEMENT OF THE CASE............................................................................3

    Relevant Procedural History .......................................................................3

    Statement of Facts.....................................................................................6

        Recession and Recovery.......................................................................6

        Creation of Big Picture and Ascension ..................................................8

            Big Picture....................................................................................8

            TED .............................................................................................9

            Ascension ....................................................................................9

            Acquisition of Bellicose................................................................9

            Intratribal Servicing Agreement ..................................................11

        Management of Big Picture and Ascension .......................................12

        Big Picture's Lending Process .........................................................13

        Benefits to the Tribe ......................................................................14

    SUMMARY OF ARGUMENT ..........................................................................15

i

STANDARD OF REVIEW ................................................................16

ARGUMENT ..................................................................................18

I.    Indian Tribes Are Sovereign Governments, and Arms of the Tribe Are Immune from Suit ..............................................18

    A.    Big Picture and Ascension Are "Arms of the Tribe" As Shown by Tribal Law ..............................................22

II.    The District Court Erred in Placing the Burden of Proof on Tribal Defendants ..................................................24

    A.    Plaintiffs have the burden of proving subject matter jurisdiction ..................................................24

    B.    The fact that sovereign immunity can be "waived" does not affect the burden of proof ..................................................25

    C.    Placing the burden on Plaintiffs would not "assume the truth" of immunity, especially where Tribal Defendants presented records showing they are arms of the Tribe ............27

    D.    Citations to "arm-of-the-state" cases conflict with well-reasoned authority specific to tribal immunity and have no application here ..................................................27

    E.    The District Court's error affected its decision ........................30

III.    Big Picture and Ascension Are Arms of the Tribe ............................31

    A.    The method of creation favors immunity ..................................33

    B.    The purpose of Big Picture and Ascension favors immunity ..................................................32

        Non-Tribal Motives ..................................................36

        The Mistaken "Effectiveness" Test ..................................................39

C.  Structure, ownership and management elements favor immunity ................................................................43

    1.  The management element favors immunity for Big Picture ..........................................................44

    2.  The management element favors immunity for Ascension..........................................................47

D.  The Tribe intended to share its sovereign immunity with Big Picture and Ascension ........................................50

E.  The financial relationship between the Tribe and the entities supports immunity ........................................52

F.  Big Picture and Ascension fulfill the purposes underlying tribal immunity..........................................................54

IV.  Weight of Factors .................................................................58

CONCLUSION ....................................................................................59

ADDENDUM A

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>CASES</u>

*Allen v. Gold County Casino*,
    464 F.3d, 1044 (9th Cir. 2006) ......................................................56

*Am. Indian Agric. Credit Consortium v. Standing Rock Sioux Tribe*,
    780 F.2d 1374 (8th Cir. 1985) ...............................................18, 48

*Behrens v. Pelletier*,
    516 U.S. 299 (1996)..........................................................................5

*Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*,
    629 F.3d 1173 (10th Cir. 2010) .............................................*passim*

*Burlington N. & Santa Fe Ry. Co. v. Vaughn*,
    509 F.3d 1085 (9th Cir. 2007) .......................................................2

*Cain v. Salish Kootenai Coll., Inc.*,
    No. CV-12-181-M-BMM, 2018 U.S. Dist. LEXIS 83451
    (D. Mont. May 17, 2018)................................................................49

*Cash Advance & Preferred Cash Loans v. Colo. ex rel. Suthers*,
    242 P.3d 1099 (Colo. 2010)........................................ 24-25, 26, 28

*Cherokee Nation v. Georgia*,
    30 U.S. 1 (1831)..........................................................................18

*Chicago Title Ins. Co. v. IMG Exeter Assoc. Ltd. Pshp.*,
    No. 92-1440, 1993 U.S. App. LEXIS 2052
    (4th Cir. Feb. 8, 1993) ..................................................................16

*City of N.Y. v. Golden Feather Smoke Shop, Inc.*,
    No. 08-CV-3966, 2009 U.S. Dist. LEXIS 20953
    (E.D.N.Y. Mar. 16, 2009)........................................................27, 28

*Cook v. AVI Casino Enters., Inc.*,
    548 F.3d 718 (9th Cir. 2008) .......................................................19

*Eckert Int'l v. Gov't of the Sovereign Democratic Republic of Fiji*,
    32 F.3d 77 (4th Cir. 1994) ..............................................................2

*E.F.W. v. St. Stephen's Indian High Sch.*,
    264 F.3d 1297 (10th Cir. 2001) ...................................................24

*Fed. Land Bank v. Gaines*,
    290 U.S. 247 (1933).......................................................................22

*Fed. Land Bank v. Priddy*,
    295 U.S. 229 (1935).......................................................................22

*Gavle v. Little Six*,
    555 N.W.2d 284 (Minn. 1996) ........................................47, 49, 50

*Gerding v. Republic of France*,
    943 F.2d 521 (4th Cir. 1991) .......................................................29

*Gould v. Davis*,
    165 F.3d 265 (4th Cir. 1998) .......................................................16

*Grayson v. Anderson*,
    816 F.3d 262 (4th Cir. 2016) .......................................................26

*Gristede's Foods, Inc. v. Unkechauge Nation*,
    660 F. Supp. 2d 442 (E.D.N.Y. 2009)....................................27, 28

*Hagen v. Sisseton-Wahpeton Cmty. College*,
    205 F.3d 1040 (8th Cir. 2000) .....................................................29

*In re Prairie Island Dakota Sioux*,
    21 F.3d 302 (8th Cir. 1994) .........................................................25

*Jiminez v. Mary Wash. Coll.*,
    57 F.3d 369 (4th Cir. 1995) ...................................................17, 18

*Kiowa Tribe of Okla. v. Manufacturing Tech. Inc.*,
    523 U.S. 751, 118 S. Ct. 1700 (1998) ...............................19, 28, 29

*Koenick v. Felton*,
    190 F.3d 259 (4th Cir. 1999) ......................................................34

*Lubrizol Enters. v. Richmond Metal Finishers,* Inc.,
    756 F.2d 1043 (4th Cir. 1985) ..............................................41, 57

*Metzgar v. KBR, Inc.*,
    744 F.3d 326 (4th Cir 2014) ......................................................16

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782, 134 S. Ct. 2024 (2014) ....................................19, 39

*Miner Elec., Inc. v. Muscogee (Creek) Nation*,
    505 F.3d 1007 (10th Cir. 2007) ..................................................25

*Mueller v. Allen*,
    463 U.S. 388 (1983)...................................................................34

*Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*,
    207 F.3d 21 (1st Cir. 2000)........................................................19

*Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*,
    498 U.S. 505 (1991)..........................................................18, 22, 39

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*,
    974 F. Supp. 2d 353 (S.D.N.Y. 2013) .........................................37

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*,
    769 F.3d 105 (2d Cir. 2014) ..................................................37, 38

*People v. Miami Nation Enters.*,
    386 P.3d 357 (Cal. 2016).....................................................*passim*

*Pistor v. Garcia*,
    791 F.3d 1104 (9th Cir. 2014) ............................................24, 26, 28

*Reising v. Mashantucket Pequot Tribal Nation*,
    No. CV-GC-2007-0149, 2010 Mashantucket App. LEXIS 4
    (Jan. 25, 2010) ..........................................................................31

*Richmond, Fredericksburg & Potomac R.R. v. United States*,
    945 F.2d 765 (4th Cir. 1991) .......................................................25

*Santa Clara Pueblo v. Martinez*,
    436 U.S. 49 (1978).......................................................................18

*Seabulk Offshore Ltd. v. American Home Assurance Co.*,
    377 F.3d 408 (4th Cir. 2004) .......................................................16

*Settlement Funding LLC v. Neumann-Lillie*,
    274 Va. 76 (2007) .........................................................................4

*Smith v. Kan. City Title & Tr. Co.*,
    255 U.S. 180 (1921).....................................................................22

*Star Scientific, Inc. v. Beales*,
    278 F.3d 339 (4th Cir. 2002) ...........................................34, 42, 58

*United States ex rel. Cain v. Salish Kootenai Coll., Inc.*,
    862 F.3d 939 (9th Cir. 2017) ................................................21, 28

*United States v. Abu Ali*,
    528 F.3d 210 (4th Cir. 2008) .......................................................17

*United States v. United States Gypsum Co.*,
    333 U.S. 364 (1948).....................................................................17

*White v. Univ. of Cal.*,
    765 F.3d 1010 (9th Cir. 2014) .........................................21, 34, 55

*Williams v. United States*,
    50 F.3d 299 (4th Cir. 1995) ..................................................25, 46

*Williamson v. Lee Optical of Okla., Inc.*,
    348 U.S. 483 (1955).....................................................................34

*Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*,
    466 F.3d 232 (2d. Cir. 2006) ................................................28, 29

## **STATUTES**

12 U.S.C. § 5517(o) ...................................................................38

25 U.S.C. §§ 2701-2721 ..........................................................39

28 U.S.C. § 1291 ........................................................................2

28 U.S.C. § 1605(a)(2)..............................................................29

## **RULES**

Fed. R. Civ. P. 12(b)(1)......................................................*passim*

Fed. R. Civ. P. 12(h) ...............................................................26

## **OTHER AUTHORITIES**

Stephen Cornell and Joseph P. Kalt, *Sovereignty and Nation-Building: The Development Challenge in Indian Country Today*, Harvard Project on American Indian Economic Development (1998), available at https://hpaied.org/sites/default/files/publications/PRS98-25.pdf ...........................48

Tribal Resolution dated August 21, 2013 ...............................................37

Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension") (collectively, "Appellants" or "Tribal Defendants"), both appearing specially, submit this brief supporting their appeal from the decision below, which denied their motion to dismiss on grounds of sovereign immunity.

## INTRODUCTION

This case involves a small tribe of American Indians who sought to better the lives of their people by conducting business with the larger society by means of the internet. Located on their reservation in Michigan, the Lac Vieux Desert Band of the Lake Superior Chippewa Indians (the "Tribe") began an online business of making small dollar loans. Since 2011, they have conducted their business through tribally-created, tribally-owned, tribally-operated companies – now, exclusively, Big Picture and Ascension. They have done well, bringing millions of dollars into the Tribal treasury, and they saw an even brighter future for the years ahead.

That future is now in jeopardy. Sued in a putative class action by certain unhappy borrowers, Appellants face not only high litigation costs, but also the potential of ruinous judgments that would destroy their ability to earn money for the Tribe and its people – and stifle Tribal economic development. The suit should never have been brought. Leaving aside its lack of merit, the lawsuit is an assault on the centuries-old federal policy of recognizing Indian tribes as sovereigns. As a sovereign, the Tribe is not only immune from suit, it has the power to conduct its

1

affairs through entities of its own creation and to share its immunity with those entities. Big Picture and Ascension are such tribally-created entities. They are arms of the Tribe and, thus, have sovereign immunity.

The District Court should have dismissed this case based on sovereign immunity, and the resulting lack of jurisdiction. It failed to do so. Now, Tribal Defendants must turn to this Court to seek dismissal, and to vindicate the long-established federal policy recognizing the sovereignty of American Indian tribes.

**STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION**

A.      There was no subject matter jurisdiction below, which is the reason for this appeal.

B.      This Court has jurisdiction under 28 U.S.C. § 1291.

C.      The Order from which the appeal is taken was entered June 26, 2018, denying Appellants' motion to dismiss on grounds of sovereign immunity. JA-141. The notice of appeal was filed July 19, 2018. JA-145-47.

D.      "Orders denying sovereign immunity are immediately appealable collateral orders." *Eckert Int'l v. Gov't of the Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 79 (4th Cir. 1994); *see Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1091 (9th Cir. 2007) ("We join the Tenth and Eleventh Circuits in holding that denial of a claim of tribal sovereign immunity is immediately appealable under the collateral order doctrine.").

## STATEMENT OF ISSUES

A.    Did the District Court err by looking outside the Tribe's official records to determine whether Tribal Defendants are arms of the Tribe and, thus, entitled to immunity?

B.    If the District Court properly looked outside the Tribe's records, did it err by placing the burden of proof – including the burden of ultimate persuasion – on Tribal Defendants, rather than on Plaintiffs?

C.    Did the District Court err in interpreting and applying the factors for determining whether Tribal Defendants are arms of the Tribe, and in refusing to dismiss the case against them based on sovereign immunity?

## STATEMENT OF THE CASE

### Relevant Procedural History

This appeal arises from a lawsuit brought by five individuals against two tribally-owned businesses, Big Picture and Ascension, and against other defendants not parties to this appeal.  The suit was filed in June 2017 in the U.S. District Court for the Eastern District of Virginia.  While the nature of the lawsuit – and its lack of merit – are not relevant to the issues on appeal, a brief discussion of those topics may provide helpful background.

Plaintiffs are Virginia consumers who borrowed money from Big Picture. Given the high risk of default among the population it serves, Big Picture charges

interest rates higher than would be allowed if state laws limiting interest rates were applicable. Its contracts with consumers provide for application of the Tribe's law, not Virginia's.

Plaintiffs, wanting to borrow money and agreeing to pay the rate charged, all signed such loan agreements. Later, after a change of heart, Plaintiffs sued Big Picture in a putative class action, alleging that its interest rates violate Virginia law as a predicate offense to RICO allegations, and seeking declaratory and injunctive relief as well as substantial monetary payments. Sued as well were Ascension, four tribal officers, and two non-tribal individuals previously affiliated with a company purchased by the Tribe.[1]

If defending on the merits, Appellants would note, *inter alia*, that Virginia allows parties to choose the law that governs their contract. *See Settlement Funding LLC v. Neumann-Lillie*, 274 Va. 76, 80 (2007) ("If a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied."). In their loan agreements, Plaintiffs and Big Picture chose the Tribe's law, and that law has not been violated. Plaintiffs' case must fail.

---

[1] The four tribal officers and one non-tribal individual have been dismissed from the case. JA-14 (ECF-50), JA-21 (ECF-122).

4

There is, however, no need to reach the merits because, as arms of the Tribe, Big Picture and Ascension are entitled to sovereign immunity. Both businesses appeared specially, JA-12 (ECF-22), moved to dismiss for lack of subject matter jurisdiction, *id.*, and supported their motion with documentation showing they are arms of the Tribe. JA-239-741, 1096-1264, 1602-1724. This documentation included Tribal legislation that created Big Picture and Ascension, stated the Tribal purposes for doing so, retained control, and expressly vested both entities with the Tribe's sovereign immunity.

Given this documentation, the District Court should have ruled in their favor. Instead, even before the Tribal Defendants filed their motion to dismiss, the District Court ordered unbounded jurisdictional discovery, JA-11, 14 (ECF-17, 49), derogating immunity at the outset.[2] Following discovery and briefing (but without oral argument), the District Court denied the motion to dismiss in an Order entered June 26, 2018, JA-141, followed by a sealed memorandum opinion on July 3, which was reissued, unchanged and unsealed, on July 27 ("Opinion"). JA-150. In its Opinion, the District Court announced, for the first time, that it was placing on Tribal Defendants the burden of proving the lack of jurisdiction. JA-199. Big Picture and Ascension noted their appeal on July 19, 2018. JA-145-47.

---

[2]    *See Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (immunity provides "a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery.").

## Statement of Facts[3]

The Lac Vieux Desert Band of the Lake Superior Chippewa Indians is a federally-recognized Indian tribe. JA-151. As such, "the Tribe is a sovereign entity that can create its own laws." *Id.* The Tribe's foundational law is its constitution ("LVD Constitution"), which establishes the tribal council ("LVD Council") and imbues that body with legislative authority, including authority to manage the Tribe's economic affairs and to delegate economic authority to organizations it charters. JA-151-52.

### Recession and Recovery

Starting in the 1990's, the Tribe sought economic self-sufficiency by operating a casino. "The casino provided significant revenue for the Tribe until 2008, when the recession severely limited the casino's revenue stream and forced the Tribe to explore other avenues to improve its finances." JA-152. One such avenue was online lending, and the Tribe went to great lengths to create an appropriate legal framework to conduct those activities. Detailed by the District Court, that legal framework included the June 2011 enactment of the Tribal Consumer Financial Services Regulatory Code. JA-152-55.

---

[3]     Unless otherwise noted, citations to the Joint Appendix in this Statement of Facts refer to the District Court's Opinion, found at JA-150-230.

Big Picture and Ascension were created in 2014 and 2015, respectively. But, some history of the Tribe's earlier online lending may be helpful.

The Tribe began lending in September 2011, through Red Rock Tribal Lending, LLC ("Red Rock"), an entity wholly-owned by the Tribe and managed by two tribal members appointed by the LVD Council. JA-156-57. "Red Rock provided loans to consumers from its offices on the Reservation, and its employees, computers, and records were all located there." JA-157. Being new to online lending, Red Rock took steps to learn the business and executed a Servicing Agreement with a non-tribal business having expertise in the field. The ensuing course of dealing included the following major features:

- The Servicing Agreement was executed in October 2011 between Red Rock and Bellicose VI, LLC ("Bellicose VI"). JA-158. In April 2012, Bellicose VI assigned its interests in the agreement to SourcePoint VI, LLC ("SourcePoint"). JA-159.[4]

- "SourcePoint's duties, although numerous, were to be limited to providing 'reasonable measures for the orderly administration and management' of Red Rock." JA-161 (quoting Servicing Agreement).

---

[4]    Bellicose VI and SourcePoint were wholly-owned by Bellicose Capital, LLC, a business affiliated with co-Defendant Matt Martorello. JA-157-58.

- "[Co-Defendant Matt] Martorello, Bellicose, and SourcePoint never, on Red Rock's behalf, made lending decisions; originated a consumer loan; purchased a loan originated by Red Rock; or took any action to collect a Red Rock loan."  JA-162.

- "Red Rock always made the final decision to lend to a particular consumer, and Red Rock's co-managers, including [Michelle] Hazen, always reviewed and approved marketing materials, including the prescreening of credit reports."  JA-162.

### Creation of Big Picture and Ascension

After a few years operating Red Rock and working with outside vendors, "the Tribe gained knowledge of the online lending industry" and "wanted to apply that knowledge to expand its online lending platform and increase profitability for the Tribe, employ more tribal members, and acquire its vendors' businesses so that the Tribe would earn more money."  JA-164.  Thus, the Tribe took several steps relevant to this appeal.

**Big Picture:** In August 2014, the LVD Council organized Big Picture, under Tribal law, as "a wholly owned and operated instrumentality of the Tribe."  JA-165 (citing August 26, 2014 Resolution (JA-364-66)).  Big Picture was managed by two tribal members, Hazen and James Williams, Jr. ("Williams"), appointed by the LVD Council.  JA-165.

In February 2016, Red Rock assigned its viable consumer loans to Big Picture, wrote off the rest, and dissolved. JA-174. Big Picture funds its operations and consumer loans with borrowed money, including more than $7 million from the Tribe. JA-178.

**TED:** In February 2015, the LVD Council organized Tribal Economic Development Holdings, LLC ("TED"), under Tribal law, and appointed Hazen and Williams as its managers. JA-165. The Tribe is TED's sole member. *Id.* Big Picture was restructured, making TED its sole member. *Id.*

**Ascension:** In February 2015, the LVD Council also created Ascension, under Tribal law, for the purpose of "engaging in marketing, technological and vendor services" to support Big Picture. JA-165-66. Like Big Picture, Ascension was created as "a wholly owned and operated instrumentality of the Tribe," with TED as its sole member. JA-166. Hazen and Williams also managed Ascension, and the LVD Council accepted their recommendation to name Brian McFadden as Ascension's President. *Id.* (citing Feb. 5, 2015 Ascension Resolution at 3 (JA-380-83)).

**Acquisition of Bellicose:** "Since 2012, Martorello and the Tribe had engaged in multiple conversations about the potential sale of Martorello's consulting companies [*e.g.*, Bellicose] to the Tribe, which would allow the Tribe to engage in online lending without relying on outside vendors for support services." JA-166.

9

Arrangements for such a sale continued through late 2015 and concluded in 2016. JA-166-68. Pursuing a sophisticated strategy detailed by the District Court, the Tribe "purchased Bellicose, including subsidiaries like SourcePoint, and acquired all of Bellicose's data, software, and corporate goodwill." JA-168. Bellicose's assets were assigned to Ascension, and its liabilities to Big Picture. JA-172. Bellicose then ceased to exist. *Id.*

The sales price was $300 million, financed by Eventide Credit Acquisitions, LLC ("Eventide"), a Martorello-related company. JA-167. Eventide loaned the money to TED, which purchased the assets of Bellicose. *Id.* Under the loan, Eventide is not guaranteed fixed installments or even payment in full. JA-168-72. After an aggressive seven-year repayment plan (ending January 2023), any remaining balance must be forgiven. JA-172.

Each month, Big Picture's gross revenues are distributed by a formula highly favorable to the Tribe. First, the Tribe receives three percent of gross revenues (it was two percent the first year). JA-168. Second, the Tribe receives another two percent to be used for reinvestment. JA-168-69. Third, other creditors are paid. JA-169. Fourth, other expenses are paid. *Id.* Finally, if anything remains, it is paid to Eventide to reduce the note obligations. JA-169-71. Under this structure, in any given month, the Tribe is guaranteed payment, but Eventide could receive nothing. JA-170-71. That has occurred at least five times. JA-171. By September 2017 (only

10

twenty months into the deal), the Tribe received nearly $5 million, while Eventide received loan repayments of approximately $20.5 million.  JA-172.

**Intratribal Servicing Agreement:** The respective duties of Big Picture and Ascension are set out in the Intratribal Servicing Agreement "similar to the earlier [agreement] between Red Rock and SourcePoint."  JA-172-73.

"Big Picture … retains the same managerial authority as Red Rock."  JA-173. For example, "'[t]he criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of [Big Picture] ... and [Big Picture] ... shall execute all necessary loan documentations.'"  JA-173-74 (quoting Intratribal Servicing Agm't § 4.2.1(k) (JA-420)).

Paid an at-cost fee, Ascension has "day-to-day operational responsibilities" and must "'develop and recommend to [Big Picture] … reasonable measures for the orderly administration and management of [Big Picture] in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of vendor relationships, collections and risk assessment.'"  JA-173 (quoting Intratribal Servicing Agm't § 4.2.1(JA-419)).

Ascension "'has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers. Final determination as to whether to lend to a consumer rests with [Big Picture] ….'"  JA-174 (quoting Intratribal Servicing Agm't § 4.1 (JA-419)).  All-in-all, "[t]he only real limitation on

11

Big Picture's authority" is that Big Picture cannot change its working relationship with Ascension during the loan's seven-year term without Eventide's consent.  JA-174.

## Management of Big Picture and Ascension

The District Court made several findings about current management arrangements:

- "TED now oversees both Big Picture and Ascension."

- "All three entities have their headquarters on the Reservation."

- "Big Picture currently employs fifteen individuals on the Reservation."

- "Ascension employs thirty-one individuals, most of whom work outside the Reservation at Ascension's satellite offices."

- "Hazen and Williams, both LVD Council members, co-manage all three companies."  As such, they have "broad authority."

- "Where the managers' power is limited by the operating agreements, the ultimate authority resides in the LVD Council."

- "All three entities must submit quarterly reports to either the LVD Council (for TED) or TED (for Big Picture and Ascension)."

- "Hazen has been Big Picture's CEO since December 2015."

- "[A]s for Ascension, Hazen and Williams have delegated [various duties] to McFadden" who "must report regularly to Hazen and

Williams" and "must obtain co-manager approval for changes in
operations, personnel, and distributions."

•    "[N]either Eventide nor Martorello participates in Ascension's day-to
day operations."

JA-175-78 (internal quotation marks and citations omitted).

## Big Picture's Lending Process

Details of Big Picture's lending process are extensive.  *See* JA-180-82.
Certain facts, however, are worth noting because they show that all lending is
handled by Big Picture's employees, all located on the Reservation.  JA-180-81.
Again, "all consumer loans are originated there."  JA-180.  Consumers seeking to
borrow money submit an online application, which Big Picture reviews through its
computerized underwriting process.  Once the application is submitted, consumers
complete several more steps, electronically acknowledging their review of terms and
disclosures, before electronically signing the loan agreement, which then undergoes
review by Big Picture for approval:

> Employees on the Reservation perform a final verification of the
> applicant's information in the loan agreement and other details. If there
> are no issues, the reviewing employee manually enters the date of
> disbursal of funds, which authorizes electronic approval of the
> agreement. This action also causes the loan to be originated and triggers
> the transmission of instructions ... to a third-party payment processor,
> which then disburses the funds to the consumer.

JA-182.  Thus, it is Big Picture that originates all loans, and it does so on the Reservation.  JA-180.

### Benefits to the Tribe

"Proceeds from Big Picture's business now comprise more than 10% of the Tribe's general fund, and those profits could possibly fund more than 30% of the Tribe's budget over the next few years."  JA-179.  Furthermore, "[t]he Tribe relies on Big Picture's funds for governmental programs and services." JA-179 (citing Williams Aff. ¶ 10 (JA-485)).  As noted by the District Court, "Big Picture's revenues have been used to, in whole or in part:

- …secure $14.1 million in financing for the Tribe's new health clinic;

- refinance casino debt;

- fund college scholarships and … educational costs for members …;

- create home ownership opportunities for members…;

- subsidize tribal members' home purchases and rentals;

- provide a bridge loan to complete the new tribal health clinic…;

- fund new vehicles for the Tribe's Police Department,

- fund an Ojibwe language program and other cultural programs;

- provide foster care payments for eligible children, propane purchase assistance, and assistance for family care…;

- cover burial and other funeral expenses…;

- fund renovations and new office space for the Tribe's Social Services Department;

- fund youth activities;

- renovate a new space for the LVD Court…; and

- fund tribal elder nutrition programs and tribal elder home care and transport services."

JA-179-80 (bullets and formatting added).

## SUMMARY OF ARGUMENT

Indian tribes have sovereign immunity. So do arms of tribes. Big Picture and Ascension have such immunity and, thus, there is no subject matter jurisdiction. The District Court erred in ruling otherwise.

Its error is due, in part, to its mistake in viewing the issue as a factual inquiry, rather than a legal one focused on *official actions of the Trib*e as a sovereign government. But, even if it is a factual inquiry, the District Court erred by shifting the burden of proof to Big Picture and Ascension. And, even if they must bear that burden, they met it.

In ruling against immunity, the District Court misunderstood and misapplied the *Breakthrough* factors used to assess arm-of-the-tribe status. For example, instead of looking at the *Tribe's* purposes in creating Big Picture and Ascension, it focused on the motives of *non-tribal* persons who dealt with the Tribe. Similarly,

15

the District Court improperly denied immunity based on its disagreement with the Tribe's business judgment and legislative decisions, its disregard for the millions of dollars in revenue that Big Picture contributed to the Tribe, its disapproval of the Tribe's using a general fund to receive and disburse those revenues, and, ultimately, its apparent distaste for the interest rates that Big Picture charges. None of these considerations are relevant to the arm-of-the-tribe inquiry. The decision of the District Court should be reversed, and the case dismissed.

## **STANDARD OF REVIEW**

"On appeal from a motion to dismiss under [Rule] 12(b)(1)," the Fourth Circuit reviews the district court's "factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." *Metzgar v. KBR, Inc.*, 744 F.3d 326, 333 (4th Cir 2014).

Issues warranting de novo review include: (1) the correct legal tests for disputed issues, *Chicago Title Ins. Co. v. IMG Exeter Assoc. Ltd. Pshp.*, No. 92-1440, 1993 U.S. App. LEXIS 2052, at *9 (4th Cir. Feb. 8, 1993); (2) what types of evidence can properly be considered under that test, *Gould v. Davis*, 165 F.3d 265, 269 (4th Cir. 1998); and (3) the proper interpretation of unambiguous, written documents, *Seabulk Offshore Ltd. v. American Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004). Such issues formed the bulk of the District Court's analysis.

16

For purely factual determinations, the "clear error" standard still requires "meaningful appellate review." *United States v. Abu Ali*, 528 F.3d 210, 261 (4th Cir. 2008). The Court has rejected the notion that "factual findings are so sacrosanct as to evade review." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 379 (4th Cir. 1995). Instead, the Court is "charged with ensuring that the district court actually makes the necessary findings, and that it makes them pursuant to the proper legal standard – that it asks and answers the right questions – in light of the record as a whole. *Id*.

A factual finding is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). Under this standard, this Court focuses on "four avenues in which the district court may go awry in arriving at its factual findings:

(1) the district court labored under an improper view or misconception of the appropriate legal standard;

(2) the district court's factual determinations are not supported by substantial evidence;

(3) the district court disregarded substantial evidence that would militate a conclusion contrary to that reached; and

(4) the district court's conclusion is contrary to the clear weight of the evidence considered in light of the entire record."

*Jiminez*, 57 F.3d at 379 (formatting added).

For the factual issues discussed below, the District Court clearly erred, given the record presented.

## ARGUMENT

## I.    Indian Tribes Are Sovereign Governments, and Arms of the Tribe Are Immune from Suit.

Sovereignty is the bedrock of every federally-recognized Indian tribe, including the Tribe here.  "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991) (quoting *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831)).  "Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation."  *Id.; see Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) ("Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers.").

Firmly rooted in this nation's history, this principle retains vitality:

The principle that Indian nations possess sovereign immunity has long been part of our jurisprudence. Indian tribes enjoy immunity because they are sovereigns predating the Constitution, and because immunity is thought necessary to promote the federal policies of tribal self-determination, economic development, and cultural autonomy.

*Am. Indian Agric. Credit Consortium v. Standing Rock Sioux Tribe*, 780 F.2d 1374, 1377-78 (8th Cir. 1985) (citations omitted).

As the District Court correctly found, all of Big Picture's consumer loans originate on the Reservation. JA-180. But, even where a tribe's commercial activities occur *outside* of tribal territories, it has immunity. *See Kiowa Tribe of Okla. v. Manuf. Tech. Inc.*, 523 U.S. 751 (1998). *Kiowa* involved a lawsuit over the tribe's failure to make timely payments on a promissory note. Sued in state court, the tribe was initially denied immunity on the theory that Indian tribes are subject to suit for their off-reservation commercial conduct. The U.S. Supreme Court reversed:

> Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation. Congress has not abrogated this immunity, nor has petitioner waived it, so the immunity governs this case.

*Id.* at 760. "[A]n Indian tribe is subject to suit *only* where Congress has authorized the suit or the tribe has waived its immunity." *Id.* at 754; *see Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2028 (2014) (declining to reconsider *Kiowa*). Plaintiffs do not claim congressional authorization or waiver, and none occurred.

Sovereign immunity remains intact when a tribe elects not to conduct commerce directly, but to use tribally-created entities qualifying as "arms of the tribe." *See, e.g., Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 725 (9th Cir. 2008) ("[T]ribal corporations acting as an arm of the tribe enjoy the same sovereign immunity granted to a tribe itself."); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 29 (1st Cir. 2000) ("The Authority, as an arm

of the Tribe, enjoys the full extent of the Tribe's sovereign immunity."). Thus, as the District Court recognized, the Tribal Defendants are "immune from suit if they qualify as arms of the Tribe." JA-192.

Big Picture and Ascension were created to generate revenues for the Tribe's treasury, and the Tribe fully intended that they operate as arms of the Tribe, with full tribal immunity. Even so, Plaintiffs challenged that immunity, and the District Court erroneously refused to recognize it. In reaching that result, the District Court misperceived the nature of the inquiry, treating the task as an inquiry into a host of circumstantial factual issues and discounting tribal law. Even if a factual inquiry were warranted, the District Court misallocated the burden of proof. In addition, the District Court invoked (but misunderstood and misapplied) the "*Breakthrough* factors." In *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010), the Tenth Circuit listed five factors to evaluate tribal economic entities:

> (1) [their] ***method of creation*** …;
>
> (2) their ***purpose***;
>
> (3) their ***structure, ownership, and management***, including the amount of control the tribe has over the entities;
>
> (4) the tribe's ***intent*** with respect to the sharing of its sovereign immunity; and
>
> (5) the ***financial relationship*** between the tribe and the entities.

*Id.* at 1187 (emphases added).

In a "catch-all," the Tenth Circuit added: "[O]ur analysis also is guided by a sixth factor: the ***policies*** underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." *Id.* (emphasis added).

Following the lead of the Tenth Circuit, the Ninth Circuit has adopted the *Breakthrough* factors, but only the first five. *See White v. Univ. of Cal.*, 765 F.3d 1010, 1025 (9th Cir. 2014); *United States ex rel. Cain v. Salish Kootenai Coll., Inc.*, 862 F.3d 939, 944 (9th Cir. 2017). While the Fourth Circuit has not adopted *Breakthrough* in either its five-factor or six-factor formulations, the five-factor approach followed by the Ninth Circuit is more appropriate under the circumstances of this case.

Under either approach, it is not necessary to find in favor of the tribal enterprise on every factor. Instead, all factors are to be weighed in the balance. Even so, when properly applied here, *each* factor weighs in the favor of Big Picture and Ascension. They are arms of the Tribe and immune from suit.

A.    **Big Picture and Ascension Are "Arms of the Tribe" As Shown by Tribal Law.**

Whether an entity is an "arm of the tribe" should not be viewed as a *factual* inquiry in which one party or the other must have the burden of proof.  It is, instead, a *legal* inquiry, where burdens of proof are typically not implicated.  Because tribes have "inherent sovereign authority," *Potawatomi*, 498 U.S. at 509, they – and they alone – have the authority to decide whether their commercial dealings will be conducted directly or through a tribally-created entity, owned and controlled by the tribe and vested with tribal immunity.

The focus, then, must be on *tribal decision-making*, as reflected by official actions of the LVD Council, the body exercising the Tribe's sovereignty.  To draw an analogy, whether an entity is an instrumentality of the federal government is determined by looking at the law creating that entity.  *See, e.g.*, *Smith v. Kan. City Title & Tr. Co.*, 255 U.S. 180, 198 (1921); *Fed. Land Bank v. Gaines*, 290 U.S. 247, 254 (1933) (reviewing legislation and finding that federal land banks are instrumentalities of federal government).  Whether a federal instrumentality is immune from suit is simply "a question of the congressional intent," a question that often can be answered by the "plain by the words of the statute."  *Fed. Land Bank v. Priddy*, 295 U.S. 229, 232 (1935).  Just as the status and immunity of federally-created entities can be shown by acts of Congress, so too can the status and immunity of tribally-created entities be shown by acts of the tribal legislature, here the LVD

Council.  Those official acts show that the LVD Council deliberately created Big Picture and Ascension as instrumentalities of its own sovereignty and expressly endowed them with its own immunity.  This conclusion is demonstrated by using the *Breakthrough* factors which, properly considered, are a legal inquiry into different aspects of a tribe's official acts, as found in tribal records.

By looking beyond official tribal acts and considering, for example, the tribal entities' subsequent success and speculations about third-party motives, the District Court erred.  Alternatively, if such factual inquiries have any role, it should only be to assess whether the presumption of immunity created by official tribal records is somehow rebutted.  In other words, once tribal entities have shown that, as a matter of tribal law, they are instrumentalities of tribal sovereignty, the inquiry should end. But, if not, then those who challenge that sovereignty should have the burden of proof.

## II.   The District Court Erred in Placing the Burden of Proof on Tribal Defendants.

Despite acknowledging that "the plaintiff bears the burden of proving subject matter jurisdiction" in response to a Rule 12(b)(1) motion, (JA-187), the District Court erroneously placed on Tribal Defendants the burden of proving the lack of jurisdiction.   JA-199.[5]   This fundamental error infected its application of the *Breakthrough* factors and contributed to its erroneous conclusion.

### A.   Plaintiffs have the burden of proving subject matter jurisdiction.

Appellants challenged subject matter jurisdiction under Rule 12(b)(1), which is the proper means of invoking tribal immunity.   *E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1302-03 (10th Cir. 2001) ("Tribal sovereign immunity is a matter of subject matter jurisdiction, which may be challenged by a motion to dismiss under Fed. R. Civ. P. 12(b)(1)."); *accord, Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2014).   The District Court *agreed* that tribal immunity is "appropriately resolved in the context of a Rule 12(b)(1) motion."   JA-187

When a Rule 12(b)(1) motion is filed, "the party asserting subject matter jurisdiction has the burden of proving its existence, *i.e.* that immunity does not bar the suit."   *Pistor*, 791 F.3d at 1111; *see also Cash Advance & Preferred Cash Loans*

---

[5]      Given the record below, Appellants proved their sovereignty even if they have the burden of proof; however, the District Court's error in this regard provides an independent basis for reversal at the threshold.

*v. Colo. ex rel. Suthers*, 242 P.3d 1099, 1113 (Colo. 2010) ("Pursuant to either Fed. R. Civ. P. 12(b)(1) or [Colorado's counterpart rule], the trial court must determine contested issues of fact, and the plaintiff, or non-moving party, bears the burden of proving jurisdiction.").

While this Court has not addressed a Rule 12(b)(1) motion in the tribal immunity context, there is no reason to deviate from how the burden has been allocated in other cases. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (in case involving claim of federal sovereign immunity, "plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged under Rule 12(b)(1)); *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) ("When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." ). Thus, the burden of proof should have been placed on Plaintiffs, and the District Court erred in ruling otherwise.

### B.    The fact that sovereign immunity can be "waived" does not affect the burden of proof.

The District Court noted an apparent circuit split on whether tribal immunity implicates subject matter jurisdiction. JA-195; *comparing Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1009 (10th Cir. 2007) ("Tribal sovereign immunity is a matter of subject matter jurisdiction . . . .") *with In re Prairie Island Dakota Sioux*, 21 F.3d 302, 305 (8th Cir. 1994) (tribal immunity "is a jurisdictional

consideration separate from subject matter jurisdiction"). The District Court stopped short of fully siding with the Eighth Circuit, saying instead that this "categorization is important: *pure* subject matter jurisdictional issues, unlike tribal immunity, cannot be waived, and must be raised sua sponte by a court if it might lack the ability to hear a case." JA-195 (emphasis added). But, the fact that tribal immunity can be waived is irrelevant to the burden of proof analysis.

First, here, tribal immunity was not waived, but vigorously asserted from the beginning.

Second, a lack of *personal* jurisdiction can also be waived. *See* Fed. R. Civ. P. 12(h). But, if the defendant challenges personal jurisdiction, "the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).

Finally, even if tribal immunity is "only quasi-jurisdictional," as the Ninth Circuit sometimes describes it, "Rule 12(b)(1) is still a proper vehicle for invoking sovereign immunity from suit," and therefore, "the party asserting subject matter jurisdiction has the burden of proving its existence, *i.e.* that immunity does not bar the suit." *Pistor*, 791 F.3d at 1111; *Cash Advance*, 242 P.3d at 1113 (requiring plaintiff to prove tribal entities are not entitled to immunity because tribal immunity "bears a substantial enough likeness to subject matter jurisdiction to be treated as such for procedural purposes").

In sum, however tribal immunity might be "categorized," it cannot justify shifting the burden of proof to Tribal Defendants on a Rule 12(b)(1) motion to dismiss.

**C.    Placing the burden on Plaintiffs would not "assume the truth" of immunity, especially where Tribal Defendants presented records showing they are arms of the Tribe.**

The District Court next contended that placing the burden on Plaintiffs "would effectively assume the truth of [Tribal Defendants'] assertion that they should be immune from suit in the same way as the Tribe itself." JA-195-96. That is incorrect. Big Picture and Ascension did not merely claim they are immune. They supported their claim with forty-four exhibits, including declarations and records of Tribal law – more than enough to show that the Tribe took the necessary steps to endow them with its own immunity. The ultimate burden of persuasion should have been borne by Plaintiffs.

**D.    Citations to "arm-of-the-state" cases conflict with well-reasoned authority specific to tribal immunity and have no application here.**

In placing the burden on Tribal Defendants, the District Court relied on two arm-of-the-tribe cases from the same New York federal district court, and one California state court case, all holding the minority view that the party asserting tribal immunity has the burden of proof. *See Gristede's Foods, Inc. v. Unkechauge Nation*, 660 F. Supp. 2d 442, 465 (E.D.N.Y. 2009); *City of N.Y. v. Golden Feather*

27

*Smoke Shop, Inc.*, No. 08-CV-3966, 2009 U.S. Dist. LEXIS 20953, at *13 (E.D.N.Y. Mar. 16, 2009); *People v. Miami Nation Enters*., 386 P.3d 357, 371 (Cal. 2016).

Not only are these cases in conflict with the Ninth Circuit's ruling in *Pistor* and Colorado's *Cash Advance* decision (*see supra* at 24-25), they largely rely on Eleventh Amendment jurisprudence and "arm-of-the-*state*" immunity claims. But, tribal and state immunities are different. *See Kiowa*, 523 U.S. at 755-56 ("[T]he immunity possessed by Indian tribes is not coextensive with that of the States."). As the Ninth Circuit explained:

> Our country has two different types of domestic sovereigns: States and Indian tribes. While they are both sovereigns, their respective sovereign immunities differ in scope. Unlike States, Indian tribes were not at the Constitutional Convention and the Eleventh Amendment doesn't apply to them. To determine the reach of tribal immunity using Eleventh Amendment case law would be anachronistic.

*Cain*, 862 F.3d at 945.

Further, the cases cited by the District Court are unpersuasive. The two federal district court cases, *Gristede's* and *Golden Feather*, rely on *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232 (2d. Cir. 2006), where the defendant claimed arm-of-the-state status under the Eleventh Amendment. *Woods* reasoned that the defendant had the burden for three reasons: (1) the state can waive its immunity, and the court is not required to raise the issue *sua sponte*, making the immunity more like an affirmative defense; (2) it is consistent with immunity claims by foreign entities under the Foreign Sovereign Immunities Act

28

("FSIA"); and (3) because the defendant possesses the information to support the immunity claim, it should be required to come forward with that information. *See id*. at 238-39. All three theories lack merit here.

First, the waiver hypothetical is unimportant for reasons already stated. *See supra* at 26. Moreover, the Eighth Circuit has *rejected* the idea that tribal immunity "is an affirmative defense that unless raised in an answer is waived." *Hagen v. Sisseton-Wahpeton Cmty. College*, 205 F.3d 1040, 1043 (8th Cir. 2000).

Second, FSIA is irrelevant because the statute has no analog for Indian tribes. *See Gerding v. Republic of France*, 943 F.2d 521 (4th Cir. 1991) (discussing burden of proof under FSIA). Here, the issue is controlled by federal common law, where plaintiffs have the burden of proving jurisdiction. Moreover, Indian tribes have *greater* immunity than foreign nations because their *commercial activities* are immune. *See Kiowa*, *supra.* Those of foreign nations are not. *See* 28 U.S.C. § 1605(a)(2).

Third, unlike the scenario that concerned *Woods*, Tribal Defendants coupled their motion to dismiss with ample information showing their immunity. Moreover, Plaintiffs were granted ample jurisdictional discovery, which put them on a level evidentiary footing.

The third theory was also used in *Miami Nation:* "[P]lacing the burden on the entity asserting immunity comports with the traditional principle that a party in

possession of facts tending to support its claim should be required to come forward with that information." 386 P.3d at 361. But, again, Tribal Defendants did exactly that. There is no need to relieve Plaintiffs of the traditional principle that the party seeking to establish jurisdiction has the burden of ultimate persuasion.

### E.    The District Court's error affected its decision.

Misallocating the burden of proof skewed the District Court's analysis. For example, on the second *Breakthrough* factor, the District Court disregarded the Tribe's stated purpose in creating Big Picture and Ascension, finding instead that the "real purpose" was to help "Martorello and Bellicose to avoid liability," which meant that Tribal Defendants "have not carried their burden on the purpose factor." JA-206. On this factor, the misplaced burden was especially damaging, given the deference owed to a government's stated purpose. *See infra* at 32-39.

On the third *Breakthrough* factor, the District Court said: "Big Picture has not shown, by a preponderance of the evidence that the Tribe… controls Big Picture, so this factor weighs against immunity…." JA-218. Change the burden, change the result.

Misallocating the burden also contributed to the District Court's repeated faulting of tribal business decisions and disregard for the business judgment rule. *See infra* at 41 (stating rule); *infra* at 39-42 (second factor); *infra* at 43-50 (third factor); *infra* at 54-58 (sixth factor).

This Court should place the burden of proof squarely on Plaintiffs and evaluate the record accordingly.

## III.    **Big Picture and Ascension Are Arms of the Tribe**.

As noted, whether an entity is the arm of a tribe is a *legal* inquiry, rather than a *factual* one, and it must be answered by looking at actions of the tribal legislature, the LVD Council, which sets Tribal law.[6]  While the *Breakthrough* factors focus on different aspects of tribal decision-making, they must be applied by looking at records that embody those decisions.    Thus, Appellants will review the *Breakthrough* factors and show that, based on official acts of the LVD Council, they satisfy each factor.  But, even if facts outside tribal decision-making are considered, they still prevail on each factor, and they prevail even if they bear the burden of proof.

In its analysis, the District Court repeatedly made the same major errors, including: (i) erroneously considering the success of the tribal entities, recognizing that success, but then concluding, in effect, that it was not good enough; (ii) judging the *Tribe's* purposes by the supposed motives of *non-tribal* persons;

---

[6]     "Modern tribal governments carry out their affairs at the legislative level by the enactment of resolutions. These enactments may create laws or regulations, address concerns affecting the tribe or a single tribal member, approve budgets large and small, or concern broad or minor policy issues." *Reising v. Mashantucket Pequot Tribal Nation*, No. CV-GC-2007-0149, 2010 Mashantucket App. LEXIS 4, at *11 (Jan. 25, 2010).

(iii) disparaging business decisions of the Tribe and tribally-appointed managers in violation of the business judgment rule; and (iv) failing to recognize that decisions made by the Tribe are decisions by a sovereign, meriting deference even beyond what the business judgment rule requires.

### A.    The method of creation favors immunity.

The first *Breakthrough* factor is "the method of creation of the economic entities." 629 F.3d at 1187. Both Big Picture and Ascension were created by the LVD Council, the body exercising the Tribe's sovereignty. Both entities were "'form[ed] under *tribal* law [which] weighs in favor of immunity,'" not "'under *state* law [which] has been held to weigh against immunity.'" JA-199 (quoting *Miami Nation*, 386 P.3d at 372 (emphasis added)).

While the District Court agreed that this factor favors immunity, JA-200, it erroneously diminished its weight due to its speculation about the entities' purpose, JA-172-73. "Purpose" is a separate factor. The District Court erred by melding the two and by its flawed analysis of purpose.

### B.    The purpose of Big Picture and Ascension favors immunity.

The second *Breakthrough* factor is the "purpose" of the entities. As with any inquiry into governmental purposes, any inquiry into the Tribe's purpose must focus on official records documenting the action taken. The LVD Council was clear about its purpose in creating Big Picture and Ascension:

- **For Big Picture:** "'diversify[ing] the economy of the Tribe's reservation in order *improve the Tribe's economic self-sufficiency.*'" JA-205 (quoting August 26, 2014 Resolution at 1 (JA-364)) (emphasis added).

- **For Ascension:** "'[t]o engage in the business of operating one or more Tribal marketing, technology and vendor service business(es),' which helps fulfill the same tribal economic development efforts." JA-205 (citing Ascension Arts. of Organization, Art. 5; February 5, 2015 Ascension Resolution at 1 (JA-380)).

In other words, the goal is to raise revenue for the Tribe so that, like any other government, it can serve the needs of its people. The means to accomplish this goal is an online lending business, with Big Picture lending, and Ascension providing various support services to Big Picture. Because the Tribe's stated purpose is a legitimate function of a tribal government, the purpose factor weighs in favor of immunity.

Even so, the District Court was not content with looking at the Tribe's stated purpose, but instead used a variation of the second factor drawn from a California case, *Miami Nation*. 386 P.3d at 357. *Miami Nation* expands the purpose factor to include two elements: "[1] the stated purpose for which the entity was created and [2] the degree to which the entity actually serves that purpose." JA-203-04 (quoting 386 P.3d at 372). The Fourth Circuit should adhere to *Breakthrough*, as adopted by

33

the Ninth Circuit in *White*, not the California variation in *Miami Nation*. But, even if the California variation is followed, the District Court misapplied it.

Like any other sovereign, tribal governments should ordinarily be taken at their word. Even when it comes to so serious a matter as an alleged violation of the Constitution, this Court has been highly deferential to a government's statement of purpose: "We have been reluctant to attribute unconstitutional motives to the States, particularly when a plausible [constitutional] purpose for the State's program may be discerned from the face of the statute." *Koenick v. Felton*, 190 F.3d 259, 265-66 (4th Cir. 1999) (internal quotation marks and citation omitted) (upholding state statute against alleged Establishment Clause violation) (citing *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983)). Here, plausible legitimate purposes (*e.g.,* economic self-sufficiency) may be discerned from the face of the resolutions creating Big Picture and Ascension. No other purpose should be attributed to the Tribe.

Of course, "the statement of [the State's] purpose [must] be sincere and not a sham." *Koenick*, 190 F.3d at 266 (internal quotation marks and citation omitted). But, in reviewing the *economic* decisions of a legislature – tribal or otherwise – courts must be "highly deferential." *Star Scientific, Inc. v. Beales*, 278 F.3d 339, 349 (4th Cir. 2002); *id.* ("'[I]t is for the legislature, not the courts, to balance the advantages and disadvantages' of economic legislation.") (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487 (1955)).

34

As for *Miami Nation's* "actual serving" inquiry, if the inquiry is only used to ferret out sham purposes, it may make sense. But, any such inquiry must be conducted in a highly-deferential manner – one not found in the decision below. Moreover, the Tribe's stated purpose is clearly genuine, especially since, as the District Court acknowledged, "more than 10% of the Tribe's general fund comes from Big Picture's revenue, and that percentage will increase to more than 30% in the next few years." JA-207-08. Because the Tribe's stated purpose – improving economic self-sufficiency – is both legitimate and rationally related to Big Picture and Ascension, the purpose factor weighs in favor of immunity even under *Miami Nation*.

Even so, the District Court reached the opposite conclusion. JA-212. In doing so, it made two major errors:

- First, rather than focusing on the *Tribe's* purpose, the District Court improperly considered the motives of *non-tribal* persons with whom the Tribe conducted business.

- Second, instead of treating *Miami Nation's* "actually serving" inquiry as a way of ferreting out sham purposes, the District Court used it to transmogrify the purpose factor into an "effectiveness" test. Then, thinking the Tribal Defendants have not been as lucrative as they should be (despite admitted benefits to the Tribe's general fund), the District

Court erroneously concluded that these two entities "have largely failed to fulfill their stated purposes." JA-212.

**Non-Tribal Motives:** The District Court asserted that "Hazen [] *lack[ed] … knowledge* about the decision to create Big Picture" and "her *unawareness teaches* that the impetus behind the formation of Big Picture and Ascension was *Martorello and Bellicose's desire to avoid liability*, more so than the Tribe's interest in starting its own business." JA-202 (emphasis added).[7] This analysis cannot withstand scrutiny.

First, it is difficult to understand how *Hazen's* alleged "lack of knowledge" or "unawareness" can teach anything about the motives of the *entire* LVD Council, which created Tribal Defendants.

Second, in all successful business transactions, there is a close fit between the motives of the contracting parties. Sam wants to sell widgets; Sally wants to buy them. Both parties have their own objectives, but the objectives are compatible, and that is why the deal works. The same is true here. Martorello and Bellicose had objectives of their own. But, that does not make the Tribe's objectives any less real or less legitimate. Indeed, the District Court acknowledged why the Tribe created Big Picture and Ascension:

---

[7]    For Hazen's alleged lack of knowledge, the District Court cited Plaintiffs' brief, which cited an ambiguous deposition colloquy involving the *name* "Big Picture." JA-202; JA-1557-58.

> The Tribe wanted to apply [its] knowledge [gained from its operation of Red Rock and relationship with Bellicose and Martorello] to expand its online lending platform and increase profitability for the Tribe, employ more tribal members, and acquire its vendors' businesses so that ***the Tribe would earn more money***.  As part of that strategy, the LVD Council organized Big Picture on August 26, 2014…

JA-164-65 (emphasis added) (citing Hazen Aff. ¶ 13 (JA-262)).[8]   These are irrefutably legitimate reasons.  Immunity is warranted.

Third, even if motives of outsiders somehow affect the analysis, it is difficult to understand why the outsiders' desire to "avoid liability" would be problematic. "Avoid liability" is just a shorthand way of saying "avoid wrongdoing and allegations thereof."  This is a good thing.

In suggesting motives for forming Tribal Defendants, the District Court discussed *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014).  In *Otoe*, motivated by a resolve to defend its sovereignty,[9] the Tribe joined with the Otoe-Missouria Tribe in a suit to block New York state

---

[8]    This quotation from Hazen affidavit refutes the suggestion that she lacked knowledge about the decision to create Big Picture.  Hazen also testified that "Big Picture was created… to bring revenue to LVD that would advance the public health, safety, and welfare of LVD's citizens through provision of essential governmental services."  JA-263.

[9]    *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 359 (S.D.N.Y. 2013) (recognizing "Plaintiffs have set forth an infringement of the Tribes' sovereignty for which the State was a cause and for which the Court's action could provide relief.").  *See also* Tribal Resolution dated August 21, 2013, at Addendum A.

regulators from taking enforcement actions threatened against them and certain vendors. The Second Circuit said the tribes "may ultimately prevail in this litigation," but it affirmed denial of a preliminary injunction on the likely-to-succeed prong, noting that "at this stage, the record is still murky." *Id.* at 118. The lawsuit went no further. The District Court suggested that the Tribal Defendants may have been formed (and Bellicose acquired) in response to *Otoe*. JA-163-64. But it cites no evidence of any such nexus and concedes that "[t]he Tribe's response to these decisions is unknown." JA-164. Moreover, discussions about acquiring Bellicose were taking place as early as 2012, JA-166, long before *Otoe*, and there is no evidence that Martorello or Bellicose were targeted by New York's threatened enforcement action. Regardless, there is no basis to infer any motivations, let alone conspiratorial ones, based on that inconclusive, voluntarily-dismissed litigation.

Perhaps, therefore, the District Court's underlying concern was dislike for the high interest rates charged here. But, "tribal immunity does not depend on [judicial] evaluation of the respectability or ethics of the business in which a tribe or tribal entity elects to engage." *Miami Nation*, 386 P.3d at 375. And, there is no federal usury law.[10] Whether there should be one and whether it should apply to tribal lenders are policy issues for Congress, which has authority to enact laws regulating

---

[10]    *See, e.g.,* 12 U.S.C. § 5517(o) (denying Consumer Financial Protection Bureau authority to establish usury limit).

38

online tribal lending just as it enacted laws regulating tribal casinos.[11]   *See Potawatomi*, 498 U.S. at 510 ("Congress has always been at liberty to dispense with such tribal immunity or to limit it.").   Judicially denying tribal immunity is not an appropriate substitute for legislative oversight.  *Bay Mills*, 134 S. Ct. at 2030-31.

**The Mistaken "Effectiveness" Test:**  The District Court misunderstood the second element of *Miami Nation's* purpose factor.  If a tribally-created entity does not actually attempt to serve the Tribe's stated purpose, that may suggest the stated purpose is a sham.  For example, suppose a tribe created an entity for the stated purpose of raising revenue through a casino.  But, then suppose the entity never tried to open a casino and simply spent money on vacations for tribal leaders.  Such a contradiction between stated purpose and implementation would suggest the stated purpose was a sham.

Here, there is no such contradiction.  As the District Court recognized (i) the stated purpose of Tribal Defendants "relate[s] to the Tribe's goal of economic self-sufficiency" by generating revenue for the Tribe, JA-205, and (ii) over two years, the Tribe received "nearly $5 million" (JA-172) from Big Picture, and these funds were used "'to fund various tribal governmental, educational, and social services.'" JA-208.  Implementation confirms the stated purpose.

---

[11]     *See* Indian Gaming Regulatory Act (25 U.S.C. §§ 2701-2721).

Even so, the District Court said this evidence was,

> far too general, as it sheds no light on **how much** Big Picture's revenue helped fund those services. That money **might**, for instance, constitute only a small, **insignificant part** of the funding for the services that Hazen has identified. If that is true, then Big Picture would not be effectively serving the Tribe's economic development. The evidence provided by Big Picture and Ascension, which bear the burden of proof here, is too vague to eliminate that possibility.

JA-208 (emphasis added). Even disregarding the misallocated burden of proof, the District Court's analysis is clearly erroneous.

First, $5 million over two years should be significant in anyone's book. Moreover, Big Picture contributes over ten percent of the Tribe's general fund, and, soon, that sum will exceed thirty percent. JA-179, 208.

Second, the District Court faulted Big Picture because it did not trace its revenue past the general fund to *specific* tribal services. But, that is not how general funds work – tribal or otherwise. Revenue from various sources is not earmarked. It all goes into the same pot, and when the tribal government spends money here or there, the funds are not stamped with the name of their original source. Even if tracing were possible, it would be irrelevant. How revenue is ultimately *allocated* among various services is a decision for the Tribal legislature and does not affect whether any given revenue *source* is an arm of the tribe.

Third, the District Court apparently thought it should *compare* revenues from Big Picture with the Tribe's revenue from other sources. Such comparisons are

misplaced. Under this misguided approach, large and robust entities would receive immunity, while fledging entities that most need such protection would be denied it. Moreover, financial success may fluctuate, making the immunity of any entity transitory and uncertain – qualities inconsistent with the permanency and certainty that should characterize sovereignty.[12]

Taking a different tack, the District Court also said: "[e]ven if Big Picture's revenue is a meaningful portion of the Tribe's general fund, the revenue received by the Tribe is a sliver of Big Picture's total earnings." JA-207. More specifically, while Big Picture has given the Tribe's general fund nearly $5 million, it has paid about $20 million to Eventide. JA-209-10. But, this should not cause concern. The money to Eventide pays for the business the Tribe bought, and the note runs for only seven years. The portion now going to Eventide will soon go to the Tribe. Under the business judgment rule, "courts should defer to – should not interfere with – decisions of corporate directors upon matters entrusted to their business judgment except upon a finding of *bad faith* or *gross abuse* of their 'business discretion.'" *Lubrizol Enters. v. Richmond Metal Finishers,* Inc., 756 F.2d 1043, 1047 (4th Cir. 1985) (emphasis added).

---

[12]    Indeed, the District Court used revenue figures and percentages from over a year ago, September 2017, which do not fully reflect the Tribal Defendants' current success.

The District Court made no such finding here. Tribal entities, no less than other businesses, are entitled to deference under the business judgment rule. Indeed, given its status as a tribal legislature, the LVD Council is entitled to even more deference. *See Star Scientific*, 278 F.3d at 349 (legislature's economic judgments entitled to high deference). The District Court erred when it implicitly substituted tribal judgments with its own.

The District Court also criticized "Big Picture's and Ascension's compensation structures," saying they "underscore the companies' poor execution of their purposes." JA-211. More specifically:

> (1) Hazen has profited from Big Picture's lending operation far more than any other tribal members, and (2) Ascension's employees are paid handsomely compared to Big Picture's employees.

JA-212.[13]

Again, the business judgment rule applies. The District Court made no finding to overcome the deference the rule requires. Nor did it otherwise conclude that anyone's compensation is too high or too low for the services they provide in the markets where they work. The District Court erred when it implicitly substituted its own business judgment for the Tribe's.

---

[13]    Hazen is the CEO of Big Picture, and earns a salary, not a "profit." Because she is CEO, it is not surprising that her salary would be higher than others. But, again, there is no evidence that it was "too high" given her services and the market.

42

### C.     Structure, ownership and management elements favor immunity.

The third *Breakthrough* factor contains three separate elements: "[1] structure, [2] ownership and [3] management," collectively identifying "the amount of control the tribe has over the entities."  629 F.3d at 1181.

- **Structure:** Big Picture and Ascension are LLC's, organized under Tribal law.  JA-199.

- **Ownership:** Big Picture and Ascension are each "100% owned and operated by its sole member, TED, which in turn is 100% owned and operated by its sole member, the Tribe."  JA-213, 218.

- **Management:** The LVD Council appointed two tribal members as co-managers of Big Picture and Ascension, as well as Ascension's President, and it retains authority to remove them.  No one else can.  JA-214.

Thus, given Tribal law, each of these elements favors immunity.  Nothing more need be considered.

The District Court apparently agreed that structure and ownership favor immunity but disagreed on management.  Yet, as shown below, even if the analysis can go beyond the LVD Council's power to hire and fire, the management element still favors immunity.  Moreover, the management element should not outweigh structure and ownership. "[O]utsourc[ing] management to a nontribal third party is

not enough, standing alone, to tilt this [third] factor against immunity." *Miami Nation*, 386 P.3d at 373.

### 1.    The management element favors immunity for Big Picture.

The District Court's third-factor analysis began by recognizing the Tribe's close control over Big Picture:

- "Big Picture is also managed by two tribal members, Hazen and Williams, who were appointed by majority vote of the LVD Council and must be removed in the same way." JA-214.  "Hazen is the company's CEO."  *Id.*

- These two tribal members have almost complete authority.  "As co-managers, Hazen and Williams are granted the broad authority to 'bind [Big Picture] individually,' and 'to do and perform all actions as may be necessary or appropriate to carry out the business of [Big Picture] including but not limited to the power to enter into contracts for services, to manage vendor relationships, [and] to manage personnel issues and affairs of [Big Picture].'" JA-214 (quoting Big Picture Operating Agm't).

- "[Hazen and Williams] are precluded only from restricting or selling Big Picture's assets or waiving its sovereign immunity, for which they must obtain TED's consent (by majority vote of the LVD Council)." *Id.*

- "[T]o the extent that Hazen and Williams are not involved in the day-to-day operations of Big Picture, the Tribe has a substantial role in those

44

operations, as [Big Picture] employs a number of tribal members and conducts all of its operations on the Reservation." *Id.*

Given this close Tribal control, the District Court correctly noted that "[t]his general structure is to assure that Big Picture is answerable to the Tribe at every level, which supports immunity." JA-214.

Even so, the District Court ended up weighing this factor against immunity, saying that "Big Picture has not shown by a preponderance of the evidence that the Tribe, through Hazen and Williams, control Big Picture…." JA-218. This change in direction cannot withstand scrutiny.

First, the District Court faulted Big Picture for outsourcing some functions to Ascension, which is also an arm of the Tribe and entitled to immunity.[14] But, even if Ascension were entirely independent of the Tribe, the District Court's criticism of outsourcing would still be misplaced. Today, many companies and governments outsource important aspects of their operations, and the fact that they do so does not mean that the company (or government) is not under the control of its owners (or officials). Stated differently, the question is whether Big Picture is controlled by the Tribe (which it is), not whether Big Picture relies on another entity to perform certain

---

[14]    These outsourced functions include providing Big Picture "prequalified leads" as well as "credit modeling data and risk assessment strategies" that Big Picture uses in deciding whether to issue a loan. JA-215.

agreed-upon tasks, while retaining others for its own employees.  *See supra* at 43-50

The District Court also faulted Williams, one of Big Picture's co-managers, based on: (1) "evidence that Williams is not familiar with three Big Picture subsidiaries," and (2) Williams' "non-involvement in Big Picture's day-to-day operations and lack of knowledge about customer service representatives' responsibilities."  JA-217-18.  From this, the District Court inferred that "Hazen and Williams do little to oversee Big Picture's operations as co-managers" and that "Big Picture has not shown, by a preponderance of the evidence that the Tribe, through Hazen and Williams, controls Big Picture, so this factor weighs against immunity for that entity."  JA-217-18.

The District Court's analysis is clear error.  To say that *Williams* may lack involvement in some aspect of Big Picture's operations is not to say that *Hazen*, the CEO, lacks such involvement – and there was no such criticism of Hazen.  Moreover, the management element is not intended to address how wisely co-managers may divide duties, or how competently they may fulfill them.  The Tribe made a *bona fide* appointment of co-managers, vesting them with broad authority, but retaining the power to remove them if it wishes to do so.  Thus, the Tribe has maintained more than enough control over Big Picture to satisfy the management element of the third factor.

46

## 2.     The management element favors immunity for Ascension.

As the District Court correctly recognized, "Hazen and Williams also manage Ascension, and the operating agreement gives them the same broad powers as with Big Picture and requires an LVD Council vote for their appointment and removal." JA-218. In addition to the two tribal co-managers, there is a non-tribal person, McFadden, who serves as Ascension's president. *Id.* But, use of an "outsider" does not mean the management element must weigh against immunity. "[C]ontrol of a corporation need not mean control of business minutiae; the tribe can be enmeshed in the direction and control of the business without being involved in the actual management." *Gavle v. Little Six*, 555 N.W.2d 284, 295 (Minn. 1996). Here, the Tribe *is* involved in the "actual management" of Ascension. But, even if it were not, it is certainly "enmeshed in the direction and control of the business," which is enough. All of this is shown by the following facts, all recognized by the District Court:

- "McFadden must obtain Hazen's or Williams' approval for 'changes in operations, personnel, or distributions…'"

- "Ascension employees have submitted request and approval forms to Hazen and Williams for certain business decisions…"

- "Ascension's operating agreement also reserves primary oversight of the company's actions for Hazen and Williams."

JA-219.

Unmoved by these facts, the District Court noted that Hazen and Williams have delegated certain matters to McFadden, including:

> [1] the "approv[al] of Ascension strategic direction," … [2] "authority to execute documents on behalf of Ascension"; [3] "authority to open and maintain bank accounts"; [4] "authority to adopt, terminate, or change employee benefit plans or programs"; and [5] "authority regarding all matters necessary for ... day to day management…"

JA-176 (quoting Ascension Delegation of Authority Policy). *See also* JA-219. Given this delegation, the District Court said the "*real management* function [of Ascension] lies not with Hazen and Williams, but with McFadden." JA-219 (emphasis added).

But this conclusion is clearly wrong. Nationwide, tribal businesses often employ non-tribal members for their management and/or subject matter expertise. This practice promotes tribal economic development, a key federal policy objective undergirding tribal immunity. *See Breakthrough*, 629 F.3d at 1195; *Am. Indian*, 780 F.2d at 1378.[15] Besides, the LVD Council appointed McFadden and requires him to "report regularly" (JA-176) to two Tribal members, Hazen and Williams, which

---

[15]    Moreover, "the evidence from Indian Country shows that the chances of being profitable rise four hundred percent where businesses are insulated from political interference in day-to-day operations." Stephen Cornell and Joseph P. Kalt, *Sovereignty and Nation-Building: The Development Challenge in Indian Country Today*, Harvard Project on American Indian Economic Development (1998), available at https://hpaied.org/sites/default/files/publications/PRS98-25.pdf.

48

shows the Tribe's involvement in the "actual management" of Ascension. Moreover, as explained above by *Gavle*, it is not even necessary for the Tribe to be involved in the "actual management" of the entity. It is sufficient that the Tribe have a more general level of involvement by being "enmeshed in the direction and control of [Ascension]." *Id.*[16]  The oversight by Hazen and Williams, who serve at the pleasure of the LVD Council, certainly show that *this* standard has been met.

Finally, the District Court expressed concern about contractual provisions that prevent TED and Ascension from modifying the service agreement between Big Picture and Ascension, or changing officers or managers of Ascension, without Eventide's consent. JA-219-20. Eventide is, of course, the non-tribal business that financed the purchase of Bellicose and holds the note on which the Tribe (via TED) must make payments for seven years. Given the importance of Ascension to the success of Big Picture, which generates the revenue to pay the note, Eventide had a legitimate business interest in securing a commitment that substantial changes in Ascension would not be made without its approval – not an unusual arrangement. For the Tribe to give such a commitment was within its business judgment. Moreover, while Eventide has a limited *veto* power over some operational and

---

[16]     The *Gavle* standard is more than necessary. *See Cain v. Salish Kootenai Coll., Inc.*, No. CV-12-181-M-BMM, 2018 U.S. Dist. LEXIS 83451 (D. Mont. May 17, 2018) (holding that tribal council's delegation of authority for day-to-day operations of tribal college does not weigh against immunity).

personnel changes, there is no evidence it ever exercised that power, JA-220, and Eventide does *not* have the power to *force* any operational or personnel changes. Even its veto power disappears when the note ends. In sum, allowing Eventide to protect its interests does not mean that the Tribe is no longer "enmeshed in the direction and control of the business." *Gavle*, 555 N.W.2d at 295. For this reason, too, the management element weighs in favor of immunity for Ascension.

### D. The Tribe intended to share its sovereign immunity with Big Picture and Ascension.

As contemplated by the fourth *Breakthrough* factor, the Tribe intended to share its immunity with both Tribal Defendants. That intention was expressed in the organizing resolutions adopted by the Tribe. For each entity, the resolution states:

> [T]he [LVD] Council believes it to be in the best interest of the Tribe to create such an entity which, as a wholly owned and operated instrumentality of the Tribe, shall be possessed of all the privileges of the Tribe, including but not limited to the sovereign immunity of the Tribe which shall not be waived unless authorized by the [LVD] Council . . . .

JA-220 (quoting Big Picture August 26, 2014 Resolution (JA-364-66); February 5, 2015 Ascension Resolution (JA-380-83)).

This intent was echoed by each entity's articles of organization: "[t]he sovereign immunity of the [entity] shall remain intact unless waived by [TED] pursuant to a duly authorized resolution of the [LVD] Council." JA-221 (quoting Big Picture Arts. of Organization, Art. 7; Ascension Arts. of Organization, Art. 7).

If these provisions in the organizing documents do not show the Tribe's intent to share its sovereign immunity, then it is difficult to imagine what language would suffice. Even "Plaintiffs concede[d] that this factor weighs in Big Picture and Ascension's favor…." JA-221.

Yet, the District Court was unmoved, saying that "on this record, the intent factor weighs *against* a finding of immunity." JA-222 (emphasis added). The District Court reached this conclusion because, in its view, "the driving force for the Tribe's intent to share its immunity" was "to help the Tribe… by providing its immunity to shelter outsiders from the consequences of their otherwise illegal actions." JA-222.

Again, the District Court's analysis is flawed. First, the proper focus of the intent factor is *whether* the Tribe intended to share its immunity with its tribal entities, not *why* it intended to do so. In any event, the intention was legitimate because immunity protects sources of tribal revenue. Second, the District Court's proffered rationale simply restates its concern about seeing Martorello and Bellicose avoid liability, which has already been addressed. *See supra* at 36-39.

51

E.    **The financial relationship between the Tribe and the entities supports immunity.**

For the fifth *Breakthrough* factor to favor of immunity, it is not necessary that the Tribe be legally liable to pay any judgment against the tribal entity. As the District Court correctly noted, "'direct tribal liability … is neither a threshold requirement for immunity nor a predominant factor in the overall analysis.'" JA-222 (quoting *Miami Nation*, 386 P.3d at 373). Thus, the fact that the Tribe would not be directly liable for any judgment against Big Picture or Ascension (JA-224) is not the focus of this inquiry.

All that is necessary for this factor to weigh in favor of immunity is for the Tribe to lose revenue if a judgment is entered against the entity. In *Breakthrough*, this factor favored of immunity because "*any* reduction in the Casino's revenue that could result from an adverse judgment against it would therefore *reduce the Tribe's income*." 629 F.3d at 1195 (emphasis added). The same is true here. As a matter of Tribal law, revenues from Big Picture are paid (through TED) into the Tribe's treasury. Similarly, the role of Ascension, as mandated by the LVD Council, is to provide services to Big Picture. Thus, any judgment against Big Picture would reduce the Tribe's income, and any judgment against Ascension would undermine its ability to provide services to Big Picture, again reducing the Tribe's income. This is all that Big Picture and Ascension need to show to satisfy the fifth factor.

Even so, the District Court weighed the fifth factor against immunity, saying that "the total distributions to the Tribe under the Note are limited" and that "the actual effect on the Tribe appears to be insubstantial." JA-225. If the funds the Tribe received from the entities were only *de minimis,* perhaps the District Court would have a point. But, again, the Tribe received $5 million in under two years, and in the years ahead, it will receive millions more. *See supra* at 40. This is certainly not *de minimis*, nor is it "limited" or "insubstantial" in any meaningful sense of those words.

The District Court also compared the percentage of Big Picture's gross revenues received by the Tribe to the percentage of casino revenues supposedly received by the Chukchansi tribe in *Breakthrough*. *See* JA-224 (quoting *Breakthrough*: "One hundred percent of the Casino's revenue goes to the Authority and then to the Tribe."). But, the term "revenue" in the quoted passage cannot mean "gross revenue." Otherwise, the casino would not be paying its employees or other expenses. It must mean "net revenue." Comparing percentages of the casino's *net* revenue and percentages of Big Picture's *gross* revenue is comparing apple and oranges.

The District Court also missed the mark when it repeats it criticism of Big Picture for "not provid[ing] an exact breakdown of revenue allocation to different

tribal services." JA-225. The flaws in this criticism have already been discussed. *See supra* at 40.

Finally, the District Court said that Big Picture may not have always made a cash distribution when balances exceeded $500, which it says is required under Big Picture's operating agreement with the Tribe. JA-225. From this, the District Court inferred: "If Big Picture does not transfer its funds to TED when it should, then the Tribe likely does not need the money on a timely basis." JA-225-26. This is both wrong and irrelevant. Consistent with good business practice, the cash distribution obligation does not apply to "cash reserves . . . reasonably necessary for the proper operation of the Company's business." Bus. Op. Art. 6, §§ 3.7, 6.2 (JA-448, 452). Besides, the fifth factor asks whether the Tribe's income would be reduced by a judgment against the tribal entity, not whether the Tribe needs payment of every last nickel the instant it is due.

By misapplying the fifth factor, the District Court again erred.

### F. Big Picture and Ascension fulfill the purposes underlying tribal immunity.

As explained by the Tenth Circuit, the final factor considers:

the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities.

Those policies include ***protection of the tribe's monies***, as well as preservation of tribal cultural autonomy, preservation of tribal self-

54

determination, and *promotion of commercial dealings between Indians and non-Indians*."

*Breakthrough*, 629 F.3d at 1187-88 (emphasis added) (internal quotation marks and citations omitted).  Under the circumstances here, this factor merely collects what other factors have already shown and, again, demonstrates that federal policies are promoted.  *See supra* at 32-54; *White*, 765 F.3d at 1025 (noting that the Ninth Circuit uses the first five factors, but not the sixth).  In any event, Big Picture and Ascension satisfy this factor as well, which supports the overall balance favoring immunity.

The District Court started with a correct explanation of this factor and begins to apply it correctly.  "At first glance, granting sovereign immunity to Big Picture and Ascension would appear to serve these purposes." JA-227.  This is certainly so, and the District Court noted some of the facts supporting its observation.

- "[M]ore than 10% of the Tribe's general fund comes from Big Picture's revenue, and that percentage will increase to more than 30% in the next few years." JA-227.

- "Hazen has stated that those funds are used to provide a variety of social services and other benefits for the Tribe."  JA-227 (internal quotation marks and citation omitted).

- "Even though Ascension does not make any money itself, it necessarily contributes to Big Picture's revenues by providing crucial technical and marketing services." JA-227.

55

"As a result," the District Court observed, "both entities seem to 'promote and fund the Tribe's self-determination through revenue generation and the funding of diversified economic development.'"  JA-227-28 (quoting *Breakthrough*, 629 F.3d at 1195).

Unfortunately, the District Court then reversed course: "However, a closer look reveals that neither Big Picture nor Ascension fulfills those goals very well, if at all."  JA-228.  But, this criticism has no merit.

First, the District Court again referred to its earlier complaint that Hazen did not trace how funds paid to the Tribe by Big Picture made their way into specific tribal services.  JA-228.  This complaint has already been refuted.  *See supra* at 40.

Second, the District Court then said that, because Hazen did not trace the funds, it "cannot tell whether granting immunity here 'directly protects… the Tribe's *treasury*.'"  JA-228 (quoting *Allen v. Gold County Casino*, 464 F.3d, 1044, 1047 (9th Cir. 2006) (emphasis added)).  This is error.  For purposes of the immunity analysis, the Tribe's treasury is protected by protecting the *inflow* of money from Big Picture.  The *outflow* of money from the Tribe's treasury is not a function of Big Picture's activities, but a function of budgetary decisions by the sovereign tribal government, which is beyond the scope of this factor.

Third, the District Court said that the actions of Big Picture and Ascension "have primarily enriched non-tribal entities like Eventide and, possibly, individuals

56

like Martorello." JA-228. But, for a tribal business to provide things of value to non-tribal entities or individuals does not argue against immunity. On the contrary, it is to be expected. *See supra* 36-39. As *Breakthrough* observes, one of the goals of immunity is "promotion of commercial dealings between Indians and non-Indians." 629 F.3d at 118. Promoting such commercial dealings means that *both* sides must receive something of value. Otherwise, no dealings will occur. Thus, the fact that Eventide received loan payments from its dealings with the Tribe is no reason to deny immunity. Again, the District Court made no finding of "bad faith" or "gross abuse," *Lubrizol*, 756 F.2d at 1047, that might justify denying deference to the judgment of the LVD Council.[17]

Putting a finer point on its complaint, the District Court noted "the sharp disparity in distributions received by the Tribe and Eventide since TED began repaying the loan." JA-228. But, the "loan" is simply the purchase money note by which the Tribe acquired valuable assets of the non-tribal business, and the "disparity in distribution" is simply the result of a mutually-agreed aggressive payment schedule lasting only seven years, regardless of whether the full face value has been paid. Thus, the note represents an investment by the Tribe to obtain substantial current income, with even greater income in the very near future.

---

[17]    Given the Tribe's status as a sovereign, even greater deference is warranted.

57

Finally, the District Court said that "granting immunity here *might* have the unintended consequence of preventing the Tribe from obtaining favorable terms in future business transactions, as non-tribal entities would not be inclined to offer repayment above a certain rate. Thus, even if the Tribe is not bound by the Note's distribution structure forever, the example will have been set." JA-229 (emphasis added). Not only is the District Court engaging in sheer speculation, it is impermissibly and paternalistically substituting its own business judgment for that of the Tribe. Not only does this violate the business judgment rule, it also violates the requirement for high deference to legislative decisions, *Star Scientific*, 278 F.3d at 349, and "the goal of Indian self-determination." *Breakthrough*, 629 F.3d at 1188.

In sum, on this final factor, the District Court was right in its initial direction, not in its final destination. Given the millions of dollars paid to the Tribe – and the millions more soon to come – Big Picture and Ascension fulfill the purposes underlying tribal sovereign immunity. Their immunity should be recognized.

## IV.  <u>Weight of Factors</u>

With each of the *Breakthrough* factors weighing in favor of sovereign immunity for both Big Picture and Ascension, the overall balance favors immunity. But, even if this Court were somehow to place some weight on the other side of the scale, given the record, the balance still favors immunity.

## CONCLUSION

For the foregoing reasons, the decision of the District Court should be reversed and the case against Big Picture and Ascension should be dismissed on grounds of sovereign immunity.  Alternatively, the decision of the District Court should be vacated, and the case remanded for reconsideration of the sovereign immunity issue, with the burden of proof placed on Plaintiffs.

**Oral argument is respectfully requested.**

Respectfully submitted,

BIG PICTURE LOANS, LLC, and
ASCENSION TECHNOLOGIES, INC.

/s/ William H. Hurd
William H. Hurd
David N. Anthony
Timothy J. St. George
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, Virginia 23219
(804) 697-1335

Justin A. Gray
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, Michigan 49071
(269) 283-5005

*Counsel for Appellants*

# ADDENDUM A

# Lac Vieux Desert Band Of Lake Superior Chippewa Tribal Government

P.O. Box 249, Pow Wow Trail • Watersmeet, Michigan 49969

Phone: 906-358-4577 • Fax: 906-358-4785



**Executive Officers:**
James Williams Jr., Tribal Chairman
Joette Pete-Baldwin, Tribal Vice-Chairwoman
Susan M. McGeshick, Tribal Treasurer
giizhigookway, Tribal Secretary

**Council Members:**
Eli Edwards
Cheryl McGeshick
John McGeshick Jr.
Tyrone McGeshick
Henry Smith

### RESOLUTION NO. T2013-054
### OF THE TRIBAL COUNCIL OF THE LAC VIEUX DESERT BAND
### OF LAKE SUPERIOR CHIPPEWA INDIANS

### RESOLUTION AUTHORIZING THE INITIATION OF LITIGATION AGAINST THE STATE OF NEW YORK, THE NEW YORK DEPARTMENT OF FINANCIAL SERVICES AND NEW YORK REGULATORS FOR THE PROTECTION AND PRESERVATION OF THE TRIBE'S SELF-DETERMINATION, SOVEREIGN RIGHTS AND THE WELFARE OF ITS CITIZENS

**WHEREAS,** The Lac Vieux Desert Band of Lake Superior Chippewa Indians (hereinafter "Tribe" or "Band") is a sovereign federally recognized Indian Tribe organized pursuant to a Constitution approved by the Tribal Membership on May 14, 1992, and as amended from time to time; and,

**WHEREAS,** The Tribe is vested with inherent sovereignty and right to self-governance; and,

**WHEREAS,** The governing body of the Tribe is the Tribal Council; and,

**WHEREAS,** The Tribal Council has the responsibility pursuant to Article IV, Section (1)(a), to "promote and protect the health, safety, education, and general welfare of the Band and its members; and,

**WHEREAS,** The Tribal Council is authorized to manage the economic affairs, enterprises, property, both real and personal, and other interests of the Tribe pursuant to Article IV, Section 1(f); and,

**WHEREAS,** The Tribal Council is authorized pursuant to Article IV, Section 1(b) of the Tribal Constitution to enact resolutions or ordinances; and,

**WHEREAS,** The Tribal Council has enacted through Tribal Council Resolution 2011-030 the Tribal Lending Regulatory Code, which is now and forever referred to as the Consumer Financial Services Regulatory Code ("Code"), as amended by Tribal Council Resolution 2011-043 and 2011-053, 2012-055; and by Motion on October, 9, 2012 to allow amendments to 7.2(e) and 12.2 (g) to be included under Tribal Council Resolution 2012-055, Tribal Council Resolution 2012-073, and Tribal Council Resolution T2013-037 to ensure it adequately regulates consumer finance operations on the Tribe's Reservation land; and,

1

Add. 1

**WHEREAS**, The Council in its effort to diversify the economy of the Tribe's Reservation in order to improve the Tribe's economic self- sufficiency did create, pursuant to tribal law, an independent tribally chartered entity, to transact business in the form of a tribally-owned consumer finance enterprise known as Red Rock Tribal; Lending, LLC ("the Company"), of which the Tribe is sole Member, pursuant to Resolution 2011-041; and,

**WHEREAS,** Income derived from the consumer finance businesses of the Tribe, in particular Red Rock Tribal Lending, LLC, provides almost fifty percent (50%) of the financial support necessary to fund essential services to Tribal citizens including but not limited to health care services, education, social services programming, housing, youth and recreation programming; and,

**WHEREAS,** Since the inception of the Tribe's consumer finance businesses more than eight (8) jobs, with plans to add ten (10) more before the end of 2014, paying an above-average wage and providing much needed opportunity for the development of a highly competent, competitive and computer savvy pool of human capital, has been added to the Lac Vieux Desert work force; and,

**WHEREAS,** Red Rock Tribal Lending, LLC, along with the Tribe's other consumer finance businesses, is regulated in accordance with Tribal law and applicable federal laws related to consumer protection by the Tribal Financial Services Regulatory Authority; and,

**WHEREAS,** On or about August 5, 2013, Red Rock Tribal Lending, LLC received cease and desist letters from the New York Department of Financial Services (DFS) falsely asserting that the Tribe's lending entities were in violation of New York civil and criminal laws, and threatening enforcement action related thereto; and

**WHEREAS,** On or about August 5, 2013, DFS sent similar notices to hundreds of financial institutions and an electronic payment association comprised of payment processors which named the Tribe's lending entities and specifically and instructed these institutions to cease doing business with them; and

**WHEREAS,** Through its actions, the State of New York, has directly threatened the sovereign rights of the Lac Vieux Desert Band of Lake Superior Chippewa, its economic development activities, and, in turn, the welfare of its citizens; and

**WHEREAS,** the Tribal Council has determined that to preserve and protect the well-being of its citizens and the self-determination, and sovereign rights of the Tribe, it is necessary to initiate legal action against the State of New York and its entities in federal court; and,

**NOW, THEREFORE, BE IT RESOLVED**      that the Lac Vieux Desert Tribal Council hereby authorizes the initiation of litigation in federal court against the State of New York, DFS, and New York Regulators, acting in their official capacity; and,

2

Add. 2

**BE IT FURTHER RESOLVED**    that the Lac Vieux Desert Tribal Council approves the inclusion of the Tribe; Red Rock Tribal Lending, LLC; and the Tribal Financial Services Regulatory Authority as Plaintiffs in the federal court action, in conjunction and coordination with other affected Indian tribes and tribal businesses; and,

**BE IT FURTHER RESOLVED**    that said approval shall be contingent upon receipt and approval of pleadings, in their final form, recommended for filing and other factors, within the sole purview of the Tribe, that may, ultimately, affect the Tribe's ability to engage in such litigation.

## CERTIFICATION

I, the undersigned, as Chairman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a tribal government operating under a Constitution adopted pursuant to Section 16 of the Indian Reorganization Act 25 U.S.C. 476 and, more specifically, 25 U.S.C. 1300(h), do hereby certify that the Tribal Council of the Band is composed of 9 members, of whom _6_, constituting a quorum, were present at a meeting duly called, noticed, convened and held on the _21st_ day of August, 2013 and that the foregoing resolution was duly adopted at said meeting by an affirmative vote of _5_ members, _0_ against, and _0_ abstaining, and that the said resolution has not been rescinded or amended in any way.

giizhigóokway – Secretary

Joette Pete-Baldwin, Tribal Vice-Chairwoman

3

Add. 3

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*12,992*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>October 15, 2018</u>          <u>/s/ William H. Hurd</u>
                                                      *Counsel for Appellants*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 15th day of October, 2018, I caused this Brief of Appellants and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Kristi C. Kelly
Casey S. Nash
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia  22030
(703) 424-7572

Matthew W.H. Wessler
GUPTA WESSLER PLLC
1900 L Street, N.W., Suite 312
Washington, D.C.  20036
(202) 888-1741

*Counsel for Appellees*

I further certify that on this 15th day of October, 2018, I caused the required copies of the Brief of Appellants and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ William H. Hurd
*Counsel for Appellants*